AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.    **20-MJ-5545** |
| Apple Cellular Telephone: iPhone 11 Serial No. C8PC42JMN72N | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, incorporated herein by reference.

located in the _____Southern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❒ contraband, fruits of crime, or other items illegally possessed;

❒ property designed for use, intended for use, or used in committing a crime;

❒ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 952 and 960 | Importation of a Controlled Substance |
| 21 USC Sec. 963 | Conspiracy to Import Controlled Substance |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

❒ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Pearlene Hill*
_____
*Applicant's signature*

Pearlene Hill, HSI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means).*

Date:  __December 29, 2020__

_____
*Judge's signature*

City and state:  __San Diego, California__     Hon. Linda Lopez, United States Magistrate Judge
_____
*Printed name and title*

## ATTACHMENT A

PROPERTY/ITEMS TO BE SEARCHED

The property/items to be searched are described as:

> Apple Cellular Telephone
> Model: iPhone 11
> Serial Number: C8PC42JMN72N
> FP&F Case No. 2020250400329301

Currently in the possession of the U.S. Customs and Border Protection located at 9495 Customhouse Plaza, San Diego, California 92154.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Authorization to search **Target Device** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below. The seizure and search of **Target Device** shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from **Target Device** will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of August 25, 2020 through September 25, 2020:

a.  tending to indicate efforts to import methamphetamine or other federally controlled substances from Mexico into the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of methamphetamine or other federally controlled substances from Mexico into the United States;

c.  tending to identify co-conspirators, criminal associates, or others involved in the importation of methamphetamine or other federally controlled substances from Mexico into the United States;

d.  tending to identify travel to or presence at locations involved in the importation of methamphetamine or other federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, **Target Device**; and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

**which are evidence of violations of Title 21, United States Code, §§ 952, 960, and 963.**

## AFFIDAVIT

I, Pearlene Hill, being duly sworn, hereby state as follows:

### INTRODUCTION

1.      I submit this affidavit in support of an application for a warrant to search the following electronic device: , (hereinafter the **Target Device**):

> Apple Cellular Telephone
> Model: iPhone 11
> Serial Number: C8PC42JMN72N
>
> FP&F Case No. 2020250400329301
> ('Target Device")

as further described in Attachment A, and to seize evidence of crimes, specifically, violations of Title 21, United States Code, Sections 952, 960 and 963, as further described in Attachment B.  The requested warrant relates to the investigation and prosecution of Ana Maria AGUILAR for importing approximately 58.10 kilograms of methamphetamine from Mexico into the United States. The Target Device is currently in the custody of United States Customs and Border Protection and located at 9495 Customhouse Plaza, San Diego, California 92154.

2.      The information contained in this affidavit is based upon my experience and training and consultation with other federal, state, and local law enforcement agents and officers who are experienced in the area of narcotics smuggling. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation.  Instead, it only contains those facts believed to be necessary to establish probable cause. All dates and times are approximate.

### EXPERIENCE AND TRAINING

3.      I am a Special Agent with HSI, which is a component agency of the DHS. I have been employed as an HSI Special Agent since May 2018. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia. I am currently assigned to the HSI DSAC San Ysidro field office in San Diego, California. My job duties are to

investigate the smuggling of controlled substances into the U.S. I have been cross-designated by the U.S. Drug Enforcement Administration (DEA) to conduct narcotics investigations and enforce provisions of the Federal Controlled Substances Act, pursuant to Title 21 of the United States Code. Prior to employment with HSI, I was employed with the U.S. Secret Service (USSS) and at the Chapel Hill Police Department (CHPD).

4.      As a HSI Special Agent, my formal training consisted of six months of residential instruction at the Federal Law Enforcement Training Center in Glynco, Georgia, which included training related to narcotics and dangerous drugs. I also learned fundamentals of how to conduct criminal investigations including, but not limited to, gathering of evidence, preservation of a crime scene, and the use of electronic evidence. I have participated in training programs related to controlled substances, including but not limited to marijuana, cocaine, methamphetamine, and heroin. I have also received training in the methods used by narcotics traffickers to import, distribute, package and conceal controlled substances. I have participated in several narcotics investigations and executed arrests for drug-related offenses, including possession with the intent to distribute, transportation, and the importation of controlled substances. Additionally, through the course of my duties as a Special Agent, I have discussed narcotics smuggling and trafficking with other experienced narcotics investigators and received informal training regarding illegal drug trends and methods of operation for multi-kilogram drug smuggling, trafficking, and dealing in the San Diego area.

5.      Based on my training and experience, I am familiar with the ways in which drug smugglers and traffickers conduct their business. During the course of my duties I have (1) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking drugs crossing the border from Mexico into the United States, and while operating inside the United States; (2) participated in the execution of search warrants on cellular phones related to drug investigations; (3) executed or participated in numerous arrests for drug-related offenses, including possession with the intent to distribute; and (4) interviewed criminal defendants, witnesses, and informants in furtherance of

1  investigations into the illegal smuggling and trafficking of controlled substances. Through
2  these duties, I have gained a working knowledge and insight into the operational habits of
3  drug smugglers and traffickers and the structure of their narcotics smuggling networks.

4        6.      Based upon my training and experience, I am aware that it is common practice
5  for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic
6  utilized by narcotics traffickers is to smuggle controlled substances into the United States
7  from Mexico by concealing the controlled substances in vehicles that enter the United States
8  at Ports of Entry such as the San Ysidro Port of Entry and the Otay Mesa Port of Entry.
9  With respect to the importation of narcotics in this manner, I am aware that narcotics
10  traffickers in Mexico frequently communicate with the individual ("the driver") responsible
11  for driving the vehicle containing the concealed narcotics into the United States. These
12  communications can occur before, during and after the narcotics are imported into the
13  United States. For example, prior to the importation, narcotics traffickers frequently
14  communicate with the driver regarding arrangements and preparation for the narcotics
15  importation. When the importation is underway, narcotics traffickers frequently
16  communicate with the driver to remotely monitor the progress of the narcotics, provide
17  instructions to the driver and warn accomplices about law enforcement activity. When the
18  narcotics have been imported into the United States, narcotics traffickers may communicate
19  with the driver to provide further instructions regarding the transportation of the narcotics
20  to a destination within the United States.

21        7.      Based upon my training, experience, and consultations with law enforcement
22  officers experienced in narcotics trafficking investigations, and all the facts and opinions
23  set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s))
24  can and often do contain electronic evidence, including, for example, phone logs and
25  contacts, voice and text communications, and data, such as emails, text messages, chats and
26  chat logs from various third-party applications, photographs, audio files, videos, and
27  location data. This information can be stored within disks, memory cards, deleted data,
28  remnant data, slack space, and temporary or permanent files contained on or in the cellular

3

telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

a.  Tending to indicate efforts to import federally controlled substances from Mexico into the United States;

b.  Tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of federally controlled substances from Mexico into the United States;

c.  Tending to identify co-conspirators, criminal associates, or others involved in the importation of federally controlled substances from Mexico into the United States;

d.  Tending to identify travel to or presence at locations involved in the importation of federally controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e.  Tending to identify the user of, or persons with control over or access to, the Target Device; and

f.  Tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

8.      According to a report prepared by CBP Officer Crane, on September 25, 2020, at approximately 6:20 p.m., Ana Maria AGUILAR, a United States citizen, made an application for admission into the United States from Mexico through the San Ysidro Port of Entry (POE).  AGUILAR presented herself as the driver, registered owner, and sole occupant of a silver 2019 Hyundai Elantra bearing California license plate 8PYN180 (the "Vehicle"). CBP Officer Crane asked AGUILAR where she was going and AGUILAR said San Marcos, California.   AGUILAR stated she went to Mexico to take care of her grandmother. AGUILAR gave CBP Officer Crane two negative customs declarations.  As CBP Officer Crane inspected the trunk, he pulled the cover off the right quarter panel and

1  observed several packages.  CBP Officer Crane checked the left quarter panel by pulling
2  off the cover and observed more packages.

3       9.     During the primary inspection, Customs and Border Protection (CBP) Canine
4  Enforcement Officer (CEO) Smolkovich and his Narcotics/Human Detector Dog (NHDD)
5  "Max" responded to the primary booths for a call for assistance reference a possible vehicle
6  with narcotics.  "Max" alerted to a trained odor and indicated at the trunk door seam of
7  AGUILAR's vehicle.

8       10.    The Z-Portal operator, CBP Officer Allar, advised the Vehicle went through
9  the Z-Portal for image analysis. CBPO Allar noticed anomalies in both rear quarter panels
10  and the rear tire storage area of the Vehicle.

11       11.    According to a report prepared by CBP Officer Akimova, he was assigned the
12  secondary inspection of the Vehicle at approximately 8:00 p.m. CBP Officer Akimova
13  extracted fifty-two (52) packages from the trunk,  sixteen (16) packages from the right rear
14  quarter panel, nine (9) packages from the left rear quarter panel, thirty-two (32) packages
15  from the bumper, thirteen (13) packages from the dash, and three (3) packages from the
16  center console. CBP Officer Boyle tested one (1) of the packages which revealed a white
17  crunchy substance that field-tested positive for the characteristics of methamphetamine. The
18  one hundred and twenty-five (125) packages were wrapped in clear plastic wrap and
19  weighed approximately 58.10 kilograms (128.08 pounds).

20       12.    AGUILAR was placed under arrest at approximately 10:00 p.m. for violating
21  Title 21 United States Code, Sections 952 and 960, Unlawful Importation of a Controlled
22  Substance. The **Target Device** was seized from AGUILAR upon her arrest.

23       13.    Based upon my experience and investigation in this case, I believe that
24  AGUILAR and other persons currently unknown, were involved in an ongoing conspiracy
25  to import and transport methamphetamine into the United States from Mexico. Based on
26  my experience investigating drug smugglers and traffickers, there is probable cause to
27  believe that AGUILAR used the **Target Device** to coordinate with coconspirators regarding
28

the importation, transportation, and distribution of methamphetamine and to otherwise further this conspiracy both inside and outside of the United States.

14.     Based upon my experience and training, consultation with other law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures and other digital information are stored in the memory of the Target Device. In light of the above facts and my experience and training, there is probable cause to believe that Defendant was using the Target Device to communicate with others to further the importation of illicit narcotics into the United States. Further, in my training and experience, narcotics traffickers may be involved in the planning and coordination of a drug smuggling event in the days and weeks prior to an event. Co-conspirators are also often unaware of a defendant's arrest and will continue to attempt to communicate with a defendant after their arrest to determine the whereabouts of the narcotics. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. Accordingly, I request permission to search the Target Device for data beginning on August 25, 2020, up to and including September 25, 2020.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

15.     Following AGUILAR's arrest on September 25, 2020, a consensual search of the **Target Device** at the port was conducted.  A logical and file system download was completed on the **Target Device**.  There have been no other attempts to obtain data from the **Target Device**.[1]

## METHODOLOGY

---

[1]     While nothing obtained in that examination is included in this affidavit, the United States, in an abundance of caution, asks the Court not to consider information agents may or may not have seen during the examination of the **Target Device** in determining whether there is probable cause for the requested warrants.

16.     It is not possible to determine, merely by knowing the cellular/mobile telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular/mobile devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular/mobile service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular/mobile telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular/mobile telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

17.     Following the issuance of this warrant, I will collect the **Target Device** and subject it to analysis. All forensic analysis of the data contained within the telephones and memory card(s) will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

18.     Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the

identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## **CONCLUSION**

19.     Based upon my experience, training, and consultation with other law enforcement officers experienced in narcotics smuggling investigations, and all the facts and circumstances described above, I submit that there is probable cause to conclude that Ana Maria AGUILAR used the **Target Device** to facilitate the offense of importing methamphetamine. The **Target Device** was likely used to facilitate the offense by transmitting and storing data, which constitutes evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 952, 960 and 963.

20.     Because the **Target Device** was promptly seized during the investigation of AGUILAR's trafficking activities and has been securely stored, there is probable cause to believe that evidence of illegal activities committed by AGUILAR continues to exist on the **Target Device**. Based on the above facts and my training and experience, there is probable cause to believe that evidence of violations of Title 21, United States Code, Sections 952, 960, and 963 will be found.

21.     Therefore, I request that the Court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A and to seize the items listed in Attachment B, using the methodology described above, for the time period from August 25, 2020 to September 25, 2020.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_Pearlene Hill_____

Pearlene Hill
Special Agent
Homeland Security Investigations

8

1   Sworn and attested to under oath by telephone, in accordance with Federal Rule of
    Criminal Procedure 4.1, this 29th day of December, 2020.

2   _____

3   Honorable Linda Lopez
    United States Magistrate Judge

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9